[Cite as *In re J.F.*, 2011-Ohio-2969.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

IN RE: J.F.                                    :

                                               :          C.A. CASE NO.    24370

                                               :          T.C. NO.    JC20077263

                                               :          (Civil appeal from Common
                                                           Pleas Court, Juvenile Division)
                                               :

                                               :

· · · · · · · · · ·

**O P I N I O N**

Rendered on the ___17th___ day of ___June___, 2011.

· · · · · · · · · ·

JAMES R. KIRKLAND, Atty. Reg. No. 0009731, 130 West Second Street, Suite 840, Dayton, Ohio 45402
        Attorney for Plaintiff-Appellant

DERRICK A. STRAHORN, Atty. Reg. No. 0034483, 6233 N. Main Street, Dayton, Ohio 45402
        Attorney for Defendant-Appellee

· · · · · · · · · ·

DONOVAN, J.

{¶ 1}  This matter is before the Court on the Notice of Appeal of Catherine Fields, filed November 30, 2010.  Fields has a son, J.F., who was born on March 21, 1991, and on March 13, 2009, Fields filed a "Motion for Extension of Support Beyond the Child's 18th Birthday Due to Mental Handicap," asking the juvenile court to extend

the child support obligation of Kwasi A. Nenonene, J.F.'s father, due to J.F.'s disabilities.

{¶ 2}   At the hearing on her Motion, which occurred on January 12, 2010, Fields and Nenonene testified.   According to Fields, J.F. "had regular milestones in terms of his developmental history.   Certain things started to look awry when he was at the age of 3, * * *  and it was at the age of 3 that he was diagnosed with attention deficit disorder.   It was at the age of 5 that we started behavioral modification as well as medication, but the behavior didn't change.   It didn't improve.   And it was later determined at the age of 7 that he was a bipolar I disorder child."   Fields testified, "[a]s of the age of 3 until currently, he has been under the treatment of multiple physicians, multiple psychiatrists, multiple psychologists, and ongoing medication therapy." J.F. has been hospitalized multiple times.

{¶ 3}   According to Fields, from ages "5 to 7, normal behavior, you know, you have tantrums and you have things of that nature, but [J.F.'s] behavior was vastly different in that a normal tantrum would last an hour to two hours.   There were suicidal ideations.   I had to protect him from himself in terms of causing harm.

{¶ 4}   "There was an incident of him trying to jump out of a moving car in – in the midst of traffic.   There was also an incident where he was very upset and angry and confused, and he tried to escape through a bedroom window onto a rooftop.

{¶ 5}   "I woke one evening – he was up very late - - to find knives covered the counter.   He was considering how to cause himself harm.   And so I had to, you know, take those knives and for a while drove around with knives and things, sharp objects in my car.   I couldn't leave them at home with him for fear that he would cause himself

harm."

{¶ 6} Fields stated, regarding J.F.'s rages, "[w]hat starts them is really [J.F.'s] inability to perceive what's going on around him. He has a sensory perception disorder. And although you and I can have a conversation and understand what we're saying by different nonverbal clues, J.F. doesn't pick up on those and hasn't picked up on those. There's improvement in those, but * * * at any given time, if there's a misperception, then a rage can ensue, and it can last from five minutes to an hour and a half to two hours."

{¶ 7} Between the ages of six to 13, before J.F. was placed in residential treatment, Fields testified, "I have holes in walls. I have holes in doors. He would break glasses, literally the glasses on his face and twist them and turn them and break them beyond recognition. Small electronics would be thrown against the wall. Even when he was smaller age - - there was time that his bedroom * * * only had a bed in it. I couldn't add additional furniture, I couldn't add pictures, because each one of those things would become a weapon either for himself to harm himself or to use * * * in a rage or to use against me.

{¶ 8} "* * * I was not able to contain him in my home and because it became unsafe for him to be at home, that's where we ended up in the residential treatment centers, where it was much more protected, where he received specialized care specifically for his ADHD, his sensory perception as well as for his bipolar disorder." According to Fields, "part of the reason for being in a residential treatment center, is for him not to be hospitalized. So he was receiving the ongoing supervision and care in hopes of mitigating the need for the hospitalization." Fields described an incident that

occurred when she was transporting J.F. to the hospital for evaluation during one of his rages and J.F. "grabbed me around my shoulder and pulled me back as I was driving. And I happened to see a traffic stop ahead of me and I saw the police officer, and I pulled over to the police officer. * * * And that police officer then phoned ahead for another officer, and then an ambulance came to that location * * * to take [J.F.] to the hospital."

{¶ 9} Regarding his schooling, Fields testified that in first grade, J.F. "was referred by the school district to alternate placement, into an alternate placement setting to help deal with his attention deficit and bipolar disorder in terms of his learning disabilities. And it's from that point on, even through his graduation from high school, that he has always been in an alternative setting for learning for school." According to Fields, J.F.'s "first placement in residential care was between the ages of 12 and 13, and he was put in Provo Canyon School in Provo, Utah, and that was actually at the direction of one of his physicians from Northwest Community Hospital. And it was a direct result of his increase in outrageous behavior, his increase in rages, his increase in anger, his increased destruction, and his overall need for a very structured environment and a very safe environment." J.F. was at the Provo Canyon School for 18 months, and then he was in "another alterative placement that didn't work out" because it "did not provide enough care and supervision for him, so then he was placed again into another residential treatment center," the Sonia Shankman Othogenic School, where he remained for three years until he left for college. While at the Othogenic School, Fields testified that J.F. had "a small job in the kitchen, * * * but he wasn't able to keep that job because it was difficult for him to juggle both school work

and his job responsibilities."

{¶ 10} In terms of supervision at the Othogenic School, J.F. had "someone in the nurse's office that was specific in terms of getting his medication. He had a primary counselor that was * * * assigned to him. He also had a therapist that was assigned to him. Above the therapist would be the program manager that watched all of [J.F.'s] care in terms of what the primary counselor was doing, what his family therapist was doing. The physician that was there he saw twice a month, was there specifically to see [J.F.]. And he also received some occupational treatment while he was at the Orthogenic School, and that program manager oversaw that, and he had two occupational therapists while he was at Sonia Shankman." Fields stated that J.F. accomplished twelfth-grade work in "some areas * * * In other areas the curriculum provided at the residential treatment center was modified."

{¶ 11} J.F.'s Discharge Summary from Sonia Shankman, dated August 6, 2009, states that J.F. was taking, each day, Sertraline, Lotrel, Geodone, Oxcarbazepin, and Amphetamine at 8:00 a.m, Adderall at 1:00 p.m., and Oxcarbazepin, Melatonin, and Geodone at 8:00 p.m. The Summary provides, in part, that J.F. was eventually moved to the transitional living center, which was the least restrictive living environment, and that he learned how to use public transportation. According to Fields, "what the report does not have is that in order for him to get to this stage, [J.F.] was accompanied six or seven times on the bus to his place, to his destination, and back. So he did - - he had to have all of that supervision in order to get to this point." The Summary indicates that J.F. took a college level math class during the summer at Harold Washington College, a junior college in downtown Chicago, and while he was able to get to and from his class,

he did not receive a passing grade. The Summary further provides, "Upon graduating from the Orthogenic School, [J.F.] still struggled in several areas. Socially, [J.F.] remains impaired and needs daily prompting as to how to engage with others appropriately. This can range from smaller more targeted behaviors (like speaking slowly enough that others can hear and understand him or making sure that he is not interrupting someone's conversation) to the more significant behaviors, which can still include him becoming visibly agitated or even storming out of a room during a conversation. [J.F.] also has not demonstrated a sustained ability to maintain a clean living environment and at times needs prompting to properly attend to his own personal hygiene. [J.F.] is often amenable to these prompts or suggestions, but at times can become defensive and even belligerent when staff have reminded him of an expectation."

{¶ 12} At the time of the hearing, J.F. was attending Lincoln College, a two year college which was chosen for him "because it has a specific program called the Access program for children with attentional disorders." According to Fields, at Lincoln, J.F. "has a specific counselor that meets with him twice a week. He also has specific study times through that program that are at least twice a week. That counselor then calls me once a week if not more readily if she thinks there is something that we need to discuss. He continues to see his doctor that prescribes medication for him. He also continues to see his psychologist that's there, and that is outside of the campus as well as counselors that are on the campus, and the nurse there will also check on [J.F.] in terms of making sure he's taking his medication. * * * He is supervised and has all of these touch points. He has to meet with his specific counselor twice a week. They

have appointments, she will go to his dorm room or she'll call him or she'll have an R.A. go to his dorm room or someone else on campus touch base with him." Fields stated Lincoln was "chosen because of its containment," that it is a four minute walk "to anywhere on campus," and that J.F. was specifically put in a residence hall across the street from the cafeteria. She stated that J.F. has never lived without supervision, and he does not have a driver's license.

{¶ 13} Regarding J.F.'s adjustment at Lincoln, Fields testified that "[i]t's been very, very, very difficult for [J.F.] in terms of his first semester at college. He still struggles with peer relationships." She stated that he has been the victim of theft offenses "four, five times * * * because the history of [J.F.] is that he's not good at choosing friends; he is not good at peer relationships; and he misjudges people. And unfortunately, those misjudgments have made him a victim in some manners on campus in terms of getting things stolen from his room and from his person * * *." Fields stated that J.F.'s grade point average was "less than a 1.0." While at Lincoln, J.F. took nine Tylenol and was taken by paramedics to the hospital. In the event that J.F. did not succeed at Lincoln, Fields stated that she would investigate "a vocational school possibly," and she stated that she did not believe J.F. could ever live full time in her home.

{¶ 14} According to Fields, "structure is important everywhere, including where it comes to money, so he has a limited amount of money that I give him each week, and it's given at the same time each week * * * to get two meals at the end of the week" because the cafeteria is closed on Saturdays and Sundays. Fields stated that J.F. can "change money. What works best for him is the use of an ATM card because he can

see the receipts and those kinds of things.

{¶ 15} "I had to teach him to check his balances in terms of the ATM and walked him through the process of * * * putting in a PIN number * * * so that he understood how much money * * * he has.

{¶ 16} "We also mitigate him in terms of - - I also mitigate his choice of money in making sure that he is making the purchases that he needs to by giving him gift cards specifically for food places, like for Subway or for Quizno's or something on the weekends to ensure that he is using his money accordingly." Fields stated that J.F. can purchase clothing for himself.

{¶ 17} Regarding hygiene, Fields stated, "in terms of his daily living activities, the cleanliness has not been an issue for him. It's more of the organization; it's more of the academics; it's more of the behavior; it's more of the outbursts; it's more of the social interactions. That's how his bipolar and his attention deficit have manifested the greatest."

{¶ 18} Regarding J.F.'s visits home from Lincoln, Fields stated, "[h]e is escorted to the train station on a van, and he is put on one train, and he is dropped off at Union Station. * * * ." When J.F. came home for Christmas in 2009, Fields stated that he had difficulty staying on task and that she had to redirect him frequently every day "to clean a room, to  pick up a bathroom, to pick up dishes. All - - all typical daily activities that you and I do, [J.F.] can start, but he won't finish or he'll start something else, in that he needs to be redirected on things constantly."

{¶ 19} Fields submitted a financial affidavit that shows that she provides dental, medical, mental health and vision coverage for J.F. She stated that she pays a yearly

premium of "about $900." The affidavit indicates that she spends $166.00 a month for J.F.'s medications and doctor's visits after insurance. She was also servicing a loan for J.F.'s education at Lincoln, with a balance due of $15,200.00.

{¶ 20} Nenonene's testimony was addressed solely to his own financial situation.

{¶ 21} On February 9, 2010, the Magistrate overruled Fields' motion. According to the Magistrate, Nenonene "is a doctor, gainfully employed and earning a sufficient income to assist in supporting the child. The Court further finds that the child's disabilities, ADHD and a bi-polar disorder, existed prior to his reaching the age of majority. However, the Court cannot determine, based on the evidence presented, that the child is incapable of supporting or maintaining himself.

{¶ 22} "It is undisputed that [J.F.] has had a history of mental health and behavioral problems, many of which resulted in hospitalizations or placement in a residential treatment center. It is also undisputed that [J.F.] has required more than the normal amount of parenting in order to become self-sufficient.

{¶ 23} "By the mother's own testimony, [J.F.] is residing in a dorm room suite at a Community College. Although he is in a specific program for students with attention deficiencies, he attends classes, obtains his own meals, takes his own medications, is able to use an ATM, purchases his own clothing, is able to use public transportation, and maintains his own personal hygiene. The mother testified that the child is struggling in his classes and may fail out and has some issues maintaining an appropriate level of cleanliness in his dorm room. Unfortunately, both of those issues are often experienced by any teenager first attending college. There is no specific relationship between an inability to maintain a clean dorm room and succeed in a first

year of college and an inability to provide for one's own basic needs.

{¶ 24} "The mother testified that should [J.F.] leave college, and not become employed, he would apply for SSI benefits. Other than paying for his college expenses, the mother is no longer taking care of [J.F.'s] day to day needs. [J.F.] has become self-sufficient enough to live on his own, although he might struggle without guidance.

{¶ 25} "As such, the Court finds that the mother failed to prove that the child is incapable of supporting or maintaining himself and failed to prove that his disability is such that it sufficiently impairs his ability to maintain himself."

{¶ 26} On February 23, 2010, Fields filed "Objections to Magistrate's Decision and Judge's Order and Request for Presentation of Additional Evidence Based upon Changed Circumstances Since the January 12, 2010 Hearing, Not Known at Time of Hearing." According to Fields, J.F. "cannot live or function in the structured educational environment and at this time is residing" in Fields' residence. On July 29, 2010, Fields filed

{¶ 27} supplemental objections, asserting that J.F. was asked to leave his college for lighting fires in the public restrooms, and that he "has been under the care of two psychologists and a psychiatrist since his removal from school. He also endured another hospitalization." Nenonene did not respond to Fields' objections.

{¶ 28} On November 5, 2010, the trial court issued a "Decision and Judgment Overruling Objections to Magistrate's Decision and Denying Request for Presentation of Additional Evidence." Regarding Fields' request to present additional evidence, the trial court concluded, if "there has been a change in circumstances since the time of the

hearing, the Mother may file a new motion to modify support." Regarding J.F.'s ability to care for himself, the court noted that "the only testimony regarding a job was that [J.F.] worked in the kitchen at Sonia Shankman Orthogenic School, which he attended during his high school years. The job ceased because [J.F.] was unable to keep up with school work and his job responsibilities. The Mother testified that, at the time of the hearing, she did not believe [J.F.] would be able to keep a job. This court finds that [J.F.] was in school at the time of the hearing. While he may not have been able to obtain and maintain a job during school, there was no testimony that [J.F.] could not obtain and maintain a job after graduation from college."

{¶ 29} Further, the court found that the "evidence shows that [J.F.] lives in a residence hall by himself at the college he attends. Although the college was chosen for [J.F.] because of the program it has for people with 'attentional disorders,' [J.F.] is able to go to class, get meals, take the bus, travel to and from college to see his Mother, all of which he does on his own. [J.F.] can also purchase clothes on his own and use an ATM to get money if needed. There was also evidence that [J.F.] can take care of his own personal hygiene without being reminded.

{¶ 30} "Additionally, despite the Mother's assertions that he has had a tumultuous semester with grades and peers, the child is still enrolled in college. The Court notes that the Mother testified to [J.F.'s] inability to keep his dorm room clean and that his grades were less than a 1.0 at the end of the semester. The Court also notes that the Mother testified [J.F.] kicked a hole in her door and had two outbursts when he came home for Christmas in 2009. This Court finds that [J.F.] is self-sufficient. Even though [J.F.] needs help learning how to use public transportation and an ATM[,] [f]or

the above reasons, the Mother's objection is overruled."

{¶ 31} Fields asserts four assignments of error. We will consider the first three assigned errors together. They are as follows:

{¶ 32} "THE TRIAL COURT COMMITTED SUBSTANTIAL ERROR WHEN IT FOUND THAT [J.F.], WHO HAS A SIGNIFICANT HISTORY OF MENTAL HEALTH AND BEHAVIORAL PROBLEMS, WAS CAPABLE OF SUPPORTING HIMSELF IN THE FUTURE," And,

{¶ 33} "THE TRIAL COURT COMMITTED SUBSTANTIAL ERROR IN ITS FAILURE TO COMPARE SIMILAR FACT PATTERNS TO [J.F.] IN ITS DETERMINATION," And,

{¶ 34} "THE TRIAL COURT COMMITTED SUBSTANTIAL ERROR IN THE FINDING THAT [J.F.] HAS BECOME SELF-SUFFICIENT AND THAT HIS MOTHER IS NO LONGER PROVIDING FOR HIS DAY TO DAY NEEDS."

{¶ 35} "An appellate court may reverse a child support order on a finding of abuse of discretion. *Shanyfelt v. Shanyfelt* (1997), 118 Ohio App.3d 243, 246 * * *." *Blacker v. Blacker*, Montgomery App. No. 20073, 2004-Ohio-2193, ¶ 18. "'Abuse of discretion' has been defined as an attitude that is unreasonable, arbitrary or unconscionable. (Internal citation omitted). It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary.

{¶ 36} "A decision is unreasonable if there is no sound reasoning process that would support that decision. It is not enough that the reviewing court, were it deciding the issue *de novo*, would not have found that reasoning process to be persuasive,

perhaps in view of countervailing reasoning processes that would support a contrary result." *AAAA Enterprises, Inc. v. River Place Community Redevelopment* (1990), 50 Ohio St.3d 157, 161.

{¶ 37} R.C. 3119.86(A)(1) provides in relevant part, "(1) The duty of support to a child imposed pursuant to a court child support order shall continue beyond the child's eighteenth birthday only under the following circumstances:

{¶ 38} "(a) The child is mentally or physically disabled and is incapable of supporting or maintaining himself or herself.

{¶ 39} "* * *."

{¶ 40} "Ordinarily, in the absence of a statutory provision to the contrary, the duty of a parent to support a child ends when the child reaches the age of majority. The law regards a normal child as capable of providing his or her own support at the age of eighteen. See R.C. 3109.01. An exception to this general rule has been recognized by a majority of states which have reviewed the question, as follows:

{¶ 41} "'* * * [But] where a child is of weak body or mind, unable to care for itself after coming of age, and remains unmarried and in the parent's home, it has been held that the parental rights and duties remain practically unchanged, and that the parent's duty to support the child continues as before. The obligation to support such a child ceases only when the necessity for the support ceases.' 39 American Jurisprudence (1942) 710, Parent and Child, Section 69." *Castle v. Castle* (1984), 15 Ohio St.3d 279, 282.

{¶ 42} Fields directs our attention to *Blacker*. Therein, we found no abuse of discretion where the trial court ordered that the father's duty of support for his son

continue beyond the age of majority. The son suffered from neurological brain damage. The trial court noted that he completed the Ohio Eligibility Determination Instrument, and "'was determined to have limitations in six of seven specific areas. Those areas include mobility, receptive and expressive language, self care, self direction, capacity for independent living, and economic self sufficiency.'" Id., ¶ 23. The son resided with his mother, and the trial court noted that she testified that "'it would be very difficult for [him] to live by himself. He must be reminded every morning to care for his personal hygiene. He has limited ability to prepare breakfast but could not prepare his own dinner. He is not able to provide his own transportation. He cannot set the alarm clock in order to get to work timely.'" Id., ¶ 24. The trial court noted that the Miami County Board of Vocational Rehabilitation helped the son find employment and trained him, and he was employed full time bagging groceries at Kroger. His doctors, "'restricted [the son] from stocking duties because he is too uncoordinated as a result of his brain damage.'" Id., ¶ 26.

{¶ 43} Fields further directs our attention to *Johnson v. Johnson* (June 8, 1990), Montgomery App. No. 11779, in which we affirmed the trial court's determination that the daughter therein "was not quite ready for independent care," and that the termination of the father's child support obligation was not justified. The daughter "was diagnosed as being developmentally handicapped in kindergarten. All during her elementary and secondary educational career she was in special classes." Upon graduation from high school, "she had a 6[th] grade math and tenth grade reading ability.

{¶ 44} "[She] has not been able to find regular employment since graduation. She worked last summer through the Bureau of Rehabilitation. She has babysat on

occasion. [She] has recently learned how to fold clothes, to do some routine household chores and can do some shopping. [She] is not able to do routine inventory of stock at a retail establishment."

{¶ 45} Fields also directs our attention to *Davis v. Davis* (June 16, 1993), Clark App. No. 2974, wherein we reversed and remanded the trial court's determination, that the son at issue  was "not incapable of supporting himself," for further proceedings to determine if he, "through his own efforts," could be self-supporting.   The son "was born blind, and has required special assistance and education all of his life.   He also has a hearing impediment.   He attended the Columbus School for the Blind, where he was trained in living skills, and graduated on June 7, 1991, at the age of 20.   He then enrolled at Wright State University, where he is studying in the field of business."   He has "been able to work in jobs made available to him through agencies such as the Ohio State School for the Blind, and,  further, * * * he has been managing his own money, and has been able to make ends meet with assistance from his mother, from the Social Security Disability Income program, and the generosity of institutions like the Bureau of Services for the Visually Impaired and Wright State University, which are providing him with free room and subsidized board while he is enrolled as a student at Wright State."

{¶ 46} We determined that the trial court "misapprehended" the holding in *Castle* to be "whether, with charitable assistance, [the child] is self-supporting."   We determined, "[s]omeone who is not capable of supporting himself without the generosity of others is not capable of supporting himself.   It may be that as a result of the generosity of others [the child] is not in need of financial assistance from his father at

this time. However, he cannot be said to be emancipated, pursuant to [*Castle*] unless and until he is capable of supporting himself without having to rely on the generosity of others."

{¶ 47} Fields distinguishes the matter herein from *Cooksey v. Cooksey* (Nov. 10, 1988) 55 Ohio App.3d 135. In *Cooksey*, the Sixth District determined that the father of an emancipated son, who had epilepsy since the age of seven and took daily medication, was not required to continue paying child support where the evidence indicated that the son was not unable to support himself. The *Cooksey* court determined that the holding in *Castle* did not apply where the evidence established that the son worked 20-25 hours a week, and "should be capable of maintaining full-time employment." In other words, the son "was capable of becoming self-supporting."

{¶ 48} Having thoroughly reviewed the record, we conclude that the juvenile court abused its discretion when it determined that "[J.F.] is self-sufficient." While the trial court noted that "there was no testimony that [J.F.] could not obtain and maintain a job after graduation from college," his only attempt at part-time employment at Sonia Shankman was unsuccessful. Fields testified that J.F. was close to failing out of Lincoln in his first semester (and according to her subsequent objections, that in fact happened). J.F. required supervision and structure while at Lincoln, and he had a specific counselor, specific study times, and a nurse to monitor his medications. He was also in the care of a physician who prescribed his multiple medications, and he met with additional counselors both on and off campus. J.F. was placed in a room across the street from the cafeteria, and Fields provided J.F. with a limited amount of money each week, at the same time each week, for meals when the school cafeteria was

closed.    She also monitored his progress on at least a weekly basis with his counselor.  Despite the extensive support system in place for J.F., he was repeatedly the victim of thefts, and he required hospitalization for taking nine Tylenol.

{¶ 49} Prior to attending Lincoln, from the age of three until the time of the hearing, Fields testified that J.F. "has been under the treatment of multiple physicians, multiple psychiatrists, multiple psychologists, and ongoing medication therapy."    The numerous interventions discussed above did not result in any significant periods of stability for J.F., and there were multiple incidents where J.F. posed a danger to himself.  J.F. spent his high school years almost exclusively in residential treatment facilities, where he was heavily supervised, to avoid further hospitalizations.

{¶ 50} J.F. is less self-sufficient than was the son in *Blacker,* who had been trained and was employed full time bagging groceries, and who was entitled to ongoing support beyond the age of majority.    Like the daughter in *Johnson*, J.F. was in special schools or programs since he was in first grade.    Like the son in *Davis*, J.F. depends on others, namely his mother, to pay for his expenses.    Unlike the son in *Cooksey*, J.F. is not capable of providing for himself.    In our view, the magistrate's finding that some of J.F.'s issues "are often experienced by any teenager attending college" is a good indication of just how far off the mark the trial court's reasoning process was.    J.F. is not a normal college freshman enjoying a typical college experience.    J.F.'s psychiatric issues clearly interfere with his ability to be self-sufficient and self-supporting.    Based upon the foregoing, it is not reasonable to conclude that J.F. "is self-sufficient."    There being an abuse of discretion, the judgment of the juvenile court is reversed.

{¶ 51} Fields' fourth assigned error is as follows:

{¶ 52} "THE TRIAL COURT COMMITTED SUBSTANTIAL ERROR IN NOT ALLOWING FOR AN ADDITIONAL HEARING ON NEW EVIDENCE THAT BECAME AVAILABLE (PRIOR TO ISSUING A DECISION)."

{¶ 53} Our resolution of the first three assigned errors renders analysis of this final assigned error moot.

. . . . . . . . . .

GRADY, P. J. and FROELICH, J., concur.

Copies mailed to:

James R. Kirkland
Derrick A. Strahorn
Hon. Anthony Capizzi